UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

SERGIA DE LOS SANTOS ROJAS,

    Plaintiff,

v.

HOSPITAL ESPAÑOL DE AUXILIO MUTUO DE PUERTO RICO, INC., et al.,

    Defendants.

Civil No. 3:13-cv-01577 (JAF)

### **MEMORANDUM OPINION AND ORDER**

### **I.**

### **Introduction**

This matter is before the court on Defendant Hospital Español Auxilio Mutuo de Puerto Rico, Inc.'s and Defendant Ms. María Gradín's motion for summary judgment, filed August 15, 2014. (Docket No. 17.)  Plaintiff opposed the motion on October 4, 2014, (Docket No. 26.), and Defendants replied in support of their motion on November 10, 2014 (Docket No. 46).  The parties submitted certified translations of their exhibits.[1] (See attachments at Docket Nos. 17, 19, 40, and 46.)

---

[1] Docket No. 17-3: Translation of Plaintiff Servia De Los Santos Rojas' Employee File.  Though Defendants provided the court with a certified translation of the employee file, certain pages are marked with a translator's note that the page is "in English and, therefore, does not require translation." (*See, e.g.* Page 140).  The court was unable to locate the original pages that did not require translation. Docket No. 19-1 contains the translation of pages 156-179 of Plaintiff's employee file that were erroneously not translated with the file submitted at Docket No. 17-3.

    Plaintiff's translated exhibits are located at Docket No. 40. Docket No. 40-1 contains Plaintiff's Exhibits 3, 4 and 5: Transfer Request Dated: March 8, 2012 (Docket No. 26-5), Transfer Request Dated: March 21, 2012 (Docket No. 26-6), and Transfer Request Dated: July 19, 2012 (Docket No. 26-7). Docket No. 40-2 is Plaintiff's Exhibit No. 6: Medical Record of Lucy López-Roig, EAP Inc. (Dr. Madeline Jiménez – psychologist) (Docket No. 26-8). Docket No. 40-3 is Plaintiff's Exhibit No. 7: Medical Record of Dr. Rafael F. Guindin Cuevas, Psychologist (Docket No. 26-9).

Upon reviewing the parties' briefs, the evidence contained in the record, and relevant case law, the court finds Defendants' motion not well-taken. For the following reasons, Defendants' motion for summary judgment is, hereby, DENIED.

## II.

## Summary Judgment Standard

Federal Rule of Civil Procedure 56 states, in pertinent part, that a court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *See also Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000). The court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990). The court may safely ignore "conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

## III.

## Facts

Plaintiff Sergia De Los Santos Rojas (hereinafter, "Plaintiff") worked for Defendant Hospital Auxilio Mutuo ("Hospital") from February 11, 2011, through September 5, 2012. During Plaintiff's employment at the Hospital, she worked as a Registered Nurse on the seventh floor and worked under Defendant Ms. María Gradín

("Gradín"). Plaintiff alleges that while employed at the Hospital, several coworkers discriminated against her and harassed her for being from the Dominican Republic. On various occasions, Plaintiff reported the harassment to her supervisor, Gradín. On August 4, 2011, the Hospital presented Plaintiff with a warning related to her unexcused absences and tardiness. Plaintiff resigned her position on August 12, 2011, but, after speaking with Gradín, she revoked her resignation. In February of 2012, Plaintiff requested a transfer out of the seventh floor to the Utilization Department as Case Manager. Plaintiff interviewed for the position, but was not selected. On March 6, 2012, Plaintiff provided a written statement to Defendants, through Gradín, describing harassing and discriminatory treatment by her coworkers. Gradín immediately interviewed each of the coworkers named in Plaintiff's letter. The Hospital conducted a second investigation independent of Gradín's. In July of 2012, at Plaintiff's request, the Hospital transferred her from the seventh floor Surgery to the fifth floor. According to Plaintiff, the transfer to the fifth floor did not stop the harassment since she still clocked in and out and changed in the seventh-floor locker rooms. In September of 2012, Plaintiff resigned.

On July 24, 2013, Plaintiff filed suit against the Hospital and Gradín alleging (1) national origin discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.,* and the Civil Rights Act of 1991, 42 U.S.C. U.S.C. § 1981a, Law No. 100, of June 30, 1959, as amended, 29 L.P.R.A. § 146, and (2) intentional and/or negligent infliction of emotional harm. Plaintiff claims that

Defendants subjected her to a hostile work environment and that the work environment was so severe and abusive that she had no other option but to resign.

## IV.

## **Hostile Work Environment**

Plaintiff claims she suffered national origin discrimination by being required to work in a hostile work environment.  Title VII of the Civil Rights Act of 1964 provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The Supreme Court has stated that "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (internal quotation and citation omitted).

To establish a prima-facie case for a hostile work environment claim, plaintiff must prove that "(1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based upon [national origin]; (4) the harassment was sufficiently severe or pervasive that it altered the conditions of her employment and created an abusive working environment; (5) the offending conduct was both objectively and subjectively offensive; and (6) some basis for employer liability has been established." *Aponte-Rivera v. DHL Solutions (USA), Inc.*, 650 F.3d 803, 808 (1st

Cir. 2011) (*citing Douglas v. J.C. Penney Co., Inc.*, 474 F.3d 10, 15 (1st Cir. 2007)). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Id. (quoting Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The conduct must be "objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Noviello v. City of Boston*, 398 F.3d 76, 92 (1st Cir. 2005) (*citing Faragher v. City of Boca Ratón*, 524 U.S. 775, 787 (1998)). "When determining whether a reasonable person would find particular conduct hostile or abusive, a court must mull the totality of the circumstances, including factors such as the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (*quoting Faragher*, 524 U.S. at 787–88). "The thrust of this inquiry is to distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment." *Id.*

**A.     Protected Class**

There is no dispute that Plaintiff is a member of a protected class; she was born in the Dominican Republic on June 18, 1979. Thereafter, Plaintiff moved to Puerto Rico; she obtained U.S. citizenship in 2006.

**B.     Co-worker Harassment**

Plaintiff's complaint stems from co-worker harassment regarding her national origin. The record demonstrates that several of Plaintiff's coworkers on the seventh floor

of the Hospital engaged in a practice of name-calling, ridicule, mockery, and insult directed at Plaintiff's Dominican accent. Beginning in August 2011, Plaintiff sought treatment and therapy regarding, among other issues, her workplace harassment. After numerous verbal reports to her supervisor regarding the harassment, Plaintiff wrote a formal complaint and delivered it to her supervisor, Gradín. In the March 6, 2012, letter, Plaintiff wrote:

> Since February 11, 2011 I have worked as a registered nurse (BSN) on the 7th Floor Surgery, since the beginning of my work as a nurse I have felt totally discriminated against by some co-workers whom I will mention below; during the shift change report I have felt disrespect toward me personally with jokes or interruptions while I perform my shift hand-over or asking out-of-place questions such as for ex.: whether I saw the patient. Sometimes very often they do not finish taking the report and they leave the table, they make signs among themselves directly about me personally with comments such as that I am stupid, that they don't understand my accent, that I cannot deny that I am "Dominican" the people who participate in said behaviors are Mrs. Maldonado, Mrs. Colon, Mrs. Encarnación, and Mr. Arbelo. On other occasions Mr. Arbelo when he addresses me personally it is in a manner of mocking my accent making me feel discriminated against based on my cultural origin in front of the rest of the co-workers. Ms. Vargas has labeled me with the nickname "Altagracia" in comparison to the humorous character of a domestic employee, who is "Dominican" who is catalogued as a stupid, uncultured, illiterate, and low income character. This nickname is employed among the aforementioned co-workers to refer to me as a person. On occasions, Mrs. Encarnación and the secretary Michel I have heard her say: that they hate to have to work when I am on duty, I have even had to be more watchful of the medical orders of my patients, given that, the secretary stores them without me having taken them and signed them. Said situation has made me feel tense and anxious, affecting my job performance and causing me stress, whenever I give instructions to the secretary or indication to call a physician, she ignores me with me eventually calling the physician, making me fall behind in my work. The environment has become very hostile among the aforementioned co-workers, making me feel discriminated against in front of the rest of the co-workers affecting me in an emotional and work-related manner.

> If until today I had not made any indication regarding said situation, it was out of fear of major reprisals toward me, on the part of these individuals given that they are plotting to make me feel like I am not worthy as a professional or as a person. Making it clear that I am a victim of discrimination due to being Dominican, having another culture, and a different accent when speaking. As if this were a crime or offense, on the shift where I am most discriminated against [is] 3-11, since, on the same there is less supervision and where these co-workers work together. I have spent a year putting up with all kinds of humiliation and racial discrimination toward me as a person and I am no longer willing to continue tolerating said situation anymore. I have been the object of mistreatment in front of patients on the part of Mrs. Encarnación and the secretary Michel, on other occasions I have had to perform the narcotics count alone when the one who hands me the keys is Mrs. Maldonado who alleges that I am very stupid and that she can't stand "Dominicans" again making an assault on me personally due to racial discrimination.
>
> During the entire year that I have been performing my duties as a nurse (BSN), I have attempted to handle the situation in a diplomatic manner and in line with my values and ethics both religious as well as professional, allowing the aforementioned situations to happen. Based on the situation, the work environment has become unmanageable and has affected me in an emotional manner and in my performance as a nurse; which is observably reflected in the absences, I have also found myself obligated to seek out professional medical help. On a personal level I feel threatened and unsafe, since these individuals may retaliate against me. I am sure that the hospital's policy is against discrimination and mistreatment, wherefore I request for an immediate solution to please be provided to me. Thank you in advance.

(Docket No. 17-3 at page 184). According to Plaintiff, and supported by her medical records, the harassing behavior continued despite her letter to Gradín. In March, Plaintiff began requesting a transfer to another unit at the Hospital to escape the harassing comments from her coworkers. Eventually, Plaintiff was transferred to the fifth floor but still had to use the seventh floor locker rooms and log in for work on the seventh floor. Plaintiff states that despite her transfer, she remained subject to name calling and racial comments from her former coworkers while using the seventh-floor facilities.

"When dealing with discriminatory harassment [ ], there is seldom, if ever, a defensible purpose behind the injurious actions. The only question is whether the bad acts, taken in the aggregate, are sufficiently severe or pervasive to constitute actionable harassment." *Noviello v. City of Boston*, 398 F.3d 76, 92-93 (1st Cir. 2005). Among other factors, this court considers the severity of the offensive conduct, the conduct's "natural tendency to humiliate" a reasonable person, the capacity for the conduct to interfere with work performance, the number of occurrences and persons involved, and the duration of the offensive conduct. *See id.* Plaintiff's coworkers subjected her to repeated racial slurs and derogatory comments meant to reference Plaintiff's national origin. The source of the offensive comments was not limited to one person, but multiple coworkers. The conduct occurred under the nose of supervisor Gradín who failed to involve herself until Plaintiff complained in writing. The conduct occurred for a lengthy duration (nineteen months) and continued even after Plaintiff spent the majority of her work day on a different floor.

The court finds that when viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find — although the evidence certainly does not compel it — that she was subjected to unwelcome harassment based upon her national origin, that the harassment was sufficiently severe or pervasive that it altered the conditions of her employment and created an abusive working environment, and that the harassment was both objectively and subjectively offensive.

C.     **Employer Liability**

Defendants argue that Plaintiff cannot establish that they are liable for the offensive conduct that she endured from her coworkers. When the hostile work environment is created by a coworker, rather than a supervisor, the "employer can only be liable if the harassment is causally connected to some negligence on the employer's part." *Noviello v. City of Boston*, 398 F.3d 76, 95 (1st Cir. 2005) (citations omitted). "Typically, this involves a showing that the employer knew or should have known about the harassment, yet failed to take prompt action to stop it." *Id.*

Sometime in April or May of 2011, Plaintiff's coworker, Ms. Aileen Mercado Figueroa, met with Gradín regarding the harassment and mockery by the other coworkers aimed at Plaintiff. Ms. Mercado advised Gradín that she had personally witnessed the coworkers calling Plaintiff "Altagracia," mocking Plaintiff's Dominican accent, laughing at Plaintiff when she spoke, calling Plaintiff "the dumb one," and otherwise verbally abusing Plaintiff. After the mockery escalated, Ms. Mercado approached Gradín a second time and informed her that the racial epithets were becoming worse, not better.

According to Plaintiff, she first aired her distress about her coworkers' name-calling and harassing behavior to her supervisor, Gradín, during her probationary evaluation on June 10, 2011. Plaintiff states that following the evaluation she complained several more times to Gradín of her coworkers' mockery and humiliation. Sometime in July or August of 2011, Mrs. Sara Arroyo Reyes witnessed Plaintiff's coworkers calling her "Altagracia." Mrs. Arroyo verbally admonished the coworker who had made the slur and reported the incident to Gradín. On August 12, 2011, Plaintiff

submitted her first resignation letter to Gradín.[2] Despite Gradín's refusal of Plaintiff's resignation, the Hospital invalidated Plaintiff's ID card, leaving her without ability to access necessary places and systems.

There is no evidence that Gradín took any steps to investigate the complaints of Plaintiff, Mrs. Arroyo or Ms. Mercado until March 6, 2012, after Plaintiff provided Gradín with a written statement regarding the objectionable behavior. Following this letter, Gradín interviewed each of the individuals mentioned. Docket No. 17-3 at 195-217. Each individual denied any ill-feelings toward Plaintiff, some even expressed surprise at the allegations, and some reported instances of misdealing with Plaintiff. Docket No. 17-3 at 195-217. This court is unaware of any documentation that the involved parties were ever disciplined by Gradín for their behavior or whether additional training occurred emphasizing the Hospital's policy for a workplace free from discrimination and harassment. Gradín requested that the Hospital conduct an additional, independent, investigation, during which each of Plaintiff's coworkers was again questioned. Docket Nos. 19-1 at 14-25 and 17-3 at 189-191. Plaintiff did not participate in the investigation. During the second round of interviews, Plaintiff's coworkers were oriented on the importance of the work environment, contributing to healthy work environment, and how certain behaviors and comments may be symptoms of harassment.

---

[2] Both parties agree that Plaintiff attempted to resign in August 2011, and that Gradín refused the resignation. Plaintiff argues that it was due to the harassment at work; Defendants argue it was for personal reasons relating to her significant other. Neither party cites to the actual resignation letter. Despite this court's complete review of the record, it has been unable to locate the original termination letter to review its contents. The medical records, however, indicate she was originally treated for both personal and work-related troubles. Viewing the evidence in the light most favorable to the nonmoving party, the Plaintiff here, the court accepts Plaintiff's explanation as true for the purpose of this motion.

According to Plaintiff, the harassing behavior continued despite her letter to Gradín and the two investigations. In March, Plaintiff began requesting to be transferred to another unit at the Hospital to escape the harassing comments from her coworkers. Despite interviewing for at least one of the positions, Plaintiff was not selected for the job postings. Plaintiff produced no evidence, however, that not being immediately transferred had anything to do with her national origin. Instead, Plaintiff continued to work on the seventh floor for an additional four months until she was transferred to the fifth floor, where she worked for the next two months prior to her resignation. According to Plaintiff, her transfer occurred only after Ms. Leyda Nieves substituted as her manager on the seventh floor, at which time Plaintiff complained to Nieves about the discriminatory behavior of her coworkers. Shortly thereafter, Nieves transferred Plaintiff from the seventh floor Surgery, where her alleged problem coworkers were assigned, to the fifth floor, where Plaintiff worked under Nieves and with new coworkers.

Plaintiff states that despite being assigned to the fifth floor, she still had to use the seventh floor locker rooms and log in for work on the seventh floor and was subjected to continuous name calling and racial comments from her former coworkers. The record shows that when Plaintiff alerted the Hospital of this error, it followed up immediately to have Plaintiff's access changed from the seventh floor to the fifth floor. Docket No. 17-3 at 120. Rather than waiting for the correction to process, Plaintiff resigned.

The question this court must answer is whether the Hospital knew or should have known of the hostile work environment and whether it promptly rectified the situation. The Hospital, through Gradín, was aware of the hostile environment surrounding Plaintiff

from June 2011, through March 6, 2012.  Gradín took no measures prior to Plaintiff's written complaint to rectify the situation.   There is no indication in Plaintiff's employee file that she formally complained of any continuing discrimination or harassment again until her resignation letter of September 5, 2012.  The medical records indicate, however, that Plaintiff continued seeking treatment for the distress caused by the workplace harassment.  The record of Plaintiff's sick leave shows that Plaintiff was absent from work from March 19, 2012, through April 11, 2012, and from August 17, 2012, through August 31, 2012, for "Severe Major Depression."  Given Gradín's and the Hospital's knowledge of Plaintiff's reason for seeking treatment, attempts to transfer out of the seventh floor, and the history of discrimination against Plaintiff's national origin, a reasonable jury could find that the Hospital knew or should have known that the hostile work environment continued and that Defendants should have investigated or otherwise reacted to the matter.

Accordingly, Plaintiff has demonstrated a basis for employer liability for at least some period of Plaintiff's employment.  Defendants' motion for judgment as a matter of law against Plaintiff's claim for Hostile Work Environment is DENIED.

## V.

### Race Discrimination in Violation of Title VII of the Civil Rights Act of 1964

Under Title VII of the Civil Rights Act of 1964, it is illegal for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e–2(a)(1).  With respect to termination, Title VII states

that "[i]t shall be an unlawful employment practice for an employer ... to discharge any individual ... because of such individual's race." 42 U.S.C. § 2000e–2(a). Where there is no direct evidence of discrimination, the court reviews the claim under the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 33 (1st Cir. 2001).

Under the *McDonnell Douglas* burden-shifting framework, a plaintiff must first establish a prima-facie case of discrimination. *Id.* This initial standard is low and is met if Plaintiff demonstrates discrimination by a preponderance of the evidence. *Zapata-Matos v. Reckitt & Colman, Inc.*, 277 F.3d 40, 44 (1st Cir. 2002). If successful, the burden then shifts to the defendant to produce evidence that it engaged in the adverse employment action for a legitimate, nondiscriminatory reason. *Straughn*, 250 F.3d at 33. The burden then shifts back to the plaintiff to show that the reasons and evidence produced by the defendant are merely pretext for discrimination. *Id.* "[T]he ultimate burden is on [Plaintiff] to persuade the trier of fact that [she was] treated differently because of [her national origin]." *Zapata-Matos*, 277 F.3d at 45 (*quoting Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 56 (1st Cir. 1999) (internal quotations marks omitted)). "On summary judgment, the question is whether plaintiff has produced sufficient evidence that [she] was discriminated against due to [her] national origin to raise a genuine issue of material fact." *Id.* (citations omitted).

**A.     Plaintiff's Prima-Facie Case of Racial Discrimination under Title VII**

The burden of production starts with the plaintiff. *Pina v. Children's Place*, 740 F.3d 785, 796 (1st Cir. 2014). To establish a prima-facie case of national origin

discrimination under Title VII, plaintiff must show that: (1) she belonged to a protected class, a racial minority; (2) she was performing her job at a level that rules out the possibility that she was fired for job performance; (3) she suffered an adverse employment action by her employer; and (4) her employer sought a replacement for her with roughly equivalent qualifications. 42 U.S.C.A. §§ 2000e *et seq*. When a plaintiff demonstrates her prima-facie case, it creates a rebuttable presumption that the employer engaged in discrimination. *Pina*, 740 F.3d at 796.

### 1. **Protected Class**

There is no dispute that Plaintiff is a member of a protected class; she was born in the Dominican Republic on June 18, 1979. Thereafter, Plaintiff moved to Puerto Rico; she obtained U.S. citizenship in 2006.

### 2. **Meeting Performance Expectations**

Plaintiff worked for the Hospital from February 11, 2011, through September 5, 2012. During her employment at the Hospital, Plaintiff's supervisor, codefendant María Gradín, evaluated Plaintiff's work performance on two occasions. The first evaluation occurred at the end of Plaintiff's ninety-day probationary period. Plaintiff received an 87.8% on her competency evaluation, and a 3.24 out of 4.00 score on her employee performance evaluation. The second evaluation was on February 28, 2012. During this evaluation, Plaintiff received a 90.48% on her competency evaluation, and a 3.26 out of 4.00 score on her employee performance evaluation. Plaintiff received low scores on the attendance-related portion of her evaluation, but Defendants did not consider this portion when determining her final score.

Accordingly, Plaintiff has met her burden of showing that she met performance expectations during her nineteen months employed at the Hospital.

### 3. Adverse Employment Action

An employment action is adverse when it "results in some tangible, negative effect on the plaintiff's employment" through "a serious and material change in the terms, conditions or privileges of employment ... as viewed by a reasonable person under the circumstances." *Rodriguez–Fonseca v. Baxter Healthcare Corp. of Puerto Rico*, 899 F.Supp.2d 141 (D.P.R.2012) (*citing Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1181–82 (11th Cir. 2003)).

Defendants took no tangible adverse employment action, like termination, demotion, or a failure to promote, against Plaintiff. Plaintiff, instead, pleads that she was "constructively discharged." She claims that she was subjected to racially-discriminatory work conditions that forced her resignation. When a plaintiff alleges constructive discharge in any employment discrimination claim, an additional element is added to the prima-facie case. *Caribbean Alliance Ins. Co.*, 851 F.Supp.2d 336, 346 (D.P.R. Feb. 10, 2012) (*citing Landrau–Romero v. Banco Popular De Puerto Rico*, 212 F.3d 607, 612 (1st Cir. 2000)). A constructive discharge normally occurs when the employee opts to end her employment, rather than work under conditions that are found to be "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign," *Dominguez v. Eli Lilly & Co.*, 958 F.Supp. 721, 735 (D.P.R. 1997); *Calhoun v. Acme Cleveland Corp.*, 798 F.2d 559, 561 (1st Cir. 1986).

As discussed above, a reasonable jury could find that Defendants subjected Plaintiff to a hostile work environment by failing to rectify the discriminatory behavior of her coworkers in a timely manner. But this does not settle the matter. Plaintiff must also show that the treatment was so hostile or degrading that no reasonable employee would tolerate continuing in the position. *Melendez–Arroyo v. Cutler–Hammer de P.R. Co., Inc.*, 273 F.3d 30, 36 (1st Cir. 2001) (*citing Serrano–Cruz v. DFI Puerto Rico, Inc.*, 109 F.3d 23, 26 (1st Cir. 1997)); *Landrau-Romero*, 212 F.3d at 612-13. In other words, that her "decision to resign was 'void of choice or free will'—that her only option was to quit." *E.E.O.C. v. Kohl's Dept. Stores, Inc.*, 774 F.3d 127, 134 (1st Cir. 2014) (*quoting Torrech–Hernández v. Gen. Elec. Co.*, 519 F.3d 41, 50 (1st Cir. 2008)). The inquiry is objective; no weight shall be given to the Plaintiff's subjective beliefs, "no matter how sincerely held." *Id.* (citations and internal quotation marks omitted).

Several facts weigh in favor of Plaintiff: Plaintiff began complaining about the harassment as early as June of 2011; at least three other employees were offended when they witnessed the harassment; the harassment caused Plaintiff to seek psychiatric therapy; the harassment continued for nineteen months and even after Plaintiff was somewhat removed from the offending coworkers; and Plaintiff's supervisor, Gradín, provided little to no assistance in rectifying the matter.

A plaintiff must have resigned within a reasonable time period after the alleged harassment for the resignation to be considered constructive discharge. *Landrau-Romero*, 212 F.3d at 613. The amount of time that lapsed between Plaintiff's March 6th letter and her resignation could weigh against her. *See Id.* (Resignation coming seven months after

alleged incidents of race-based mistreatment cannot be labeled as constructive discharge.); *Smith v. Bath Iron Works Corp.*, 943 F.2d 164, 167 (1st Cir. 1991) (six months not a reasonable time period for resignation to be considered constructive discharge). Plaintiff continued her employment for six months after the March 6th letter, after which there is no documented evidence of mistreatment.

When considering the evidence in the light most favorable to Plaintiff, the non-moving party, a reasonable jury could believe that Plaintiff, despite not reporting additional harassment to her supervisor between March 6 and her resignation, such harassment did occur. A reasonable jury could believe that Plaintiff was so discouraged by the lack of attention given to her previous complaints that continuing to complain would have no effect on the situation. Moreover, a reasonable jury could find that, after having complained both verbally and in writing to her manager on several occasions, after seeking a transfer to escape the mistreatment only to continue to be subjected to it due to a "glitch" in the system, and after at least two other coworkers complained about witnessing the abusive behavior, a reasonable person would have no other choice but to resign. Plaintiff has created a material issue of fact as to whether a reasonable person would have continued to remain at the Hospital any longer.

Because the court finds that a reasonable person in Plaintiff's position would have concluded that resigning from her job was her only available choice, Plaintiff has met the "reasonable person" element for a constructive discharge claim.

## B. <u>Non-discriminatory Explanation for Adverse Employment Action</u>

Typically, the next step in the burden-shifting analysis is for the Hospital to articulate a legitimate, non-discriminatory reason for the adverse employment action. Given the nature of Plaintiff's allegations, however – that the Hospital subjected her to a racially-discriminatory hostile work environment which left her no choice but to resign – the Hospital cannot provide (and has not attempted to) a non-discriminatory reason for the racially-charged mockery or name-calling. Instead, Defendants argue: (1) that the facts are not severe or pervasive enough to support a constructive discharge claim; (2) that Plaintiff voluntarily resigned to avoid termination; and (3) that Defendants are not liable for any harassment or discrimination that occurred by Plaintiff's coworkers.

First, Defendants argument that Plaintiff was not constructively discharged because she voluntarily resigned knowing that she faced termination for her poor attendance record and insubordination is misplaced. The argument first and foremost calls into credibility the reasons Plaintiff claims caused her resignation. As such, the issue must be resolved by a jury. Next, while the underlying facts may be argued to assert that Plaintiff has no claim to lost wages, they do not serve to offer a legitimate reason for the alleged hostile work environment.

As discussed above, Defendants' remaining two arguments are questions of fact that must be resolved by a jury.

## V.

## **Conclusion**

For the reasons set forth above, the court finds that Plaintiff produced evidence from which a reasonable jury could decide the matter in her favor. Plaintiff has met her burden to overcome Defendants' motion for summary judgment. Accordingly, Defendants' motion for summary judgment (Docket No. 17) is, hereby, **DENIED**.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, this 10th day of February, 2015.

                                                                                    S/José Antonio Fusté
                                                                                    JOSE ANTONIO FUSTE
                                                                                    U.S. DISTRICT JUDGE